**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 20, 2018**

# In the Court of Appeals of Georgia

A18A0528. LIBRI v. THE STATE.

REESE, Judge.

A Douglas County jury found Paul Michael Libri guilty beyond a reasonable doubt of two felony counts of impersonating a peace officer,[1] one felony count of identity fraud,[2] and one misdemeanor count of obstructing a law enforcement officer.[3] He was sentenced to a total of twenty years, with the first five years in confinement and the remainder on probation. Following the denial of his motion for new trial, he files this appeal, arguing there was insufficient evidence to support his convictions. For the reasons set forth infra, we affirm.

---

[1] See OCGA § 16-10-23.

[2] See OCGA § 16-9-121 (a) (1).

[3] See former OCGA § 16-10-24 (a) (2014).

In an appeal following a criminal conviction, we view the evidence in the light most favorable to the jury's verdict.[4] So viewed, the evidence shows that, on May 12, 2014, 17-year-old N. C. did not return home from school. According to N. C.'s friends, N. C. left school at around 10:00 a.m. that morning. N. C.'s mother testified that she argued with her daughter the previous night and took away N. C.'s cell phone. After calling friends and family without finding N. C., N. C.'s mother contacted the Douglas County Sheriff's Office ("DCSO") and reported her daughter missing. Investigator Jones from the DCSO was assigned to the investigation.

On May 13, N. C.'s mother was contacted on her cell phone by "Tim Taylor," who was later identified as the Appellant.[5] N. C.'s mother testified that the Appellant told her he obtained her phone number from a friend of her daughter through "Facebook or Instagram." N. C.'s mother denied giving her daughter's friend permission to give out her phone number.

During the first of four or five phone conversations, the Appellant told N. C.'s mother that he was an investigator with the Metro Atlanta Metro Human Trafficking

---

[4] See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[5] The Appellant told N. C.'s mother that he was going to send her an e-mail and that it would refer to "Paul," because "I go by Paul."

Task Force, and, based on his title and the name of the organization, she thought that the Appellant was part of "law enforcement" and a "top-notch investigator." He told her that he used to be a police officer in Atlanta and had resources that "a regular Police Department or a Sheriff's Department" might not have. The Appellant told her that he would find N. C. and that he "ha[d] found many [other missing children]." He also told N. C.'s mother that her daughter could be at risk for human trafficking.

At the Appellant's request, N. C.'s mother provided him with her and N. C.'s personal information, including their full names, birth dates, social security numbers, e-mail addresses, passwords, and social media accounts. She also gave him a description of N. C., including "[e]verything about her appearance[,]" pictures of her daughter, N. C.'s interests and activities, and provided the names of her friends. N. C.'s mother testified that she was desperate to find her daughter and thought the Appellant would find her because he asked for information that the DCSO had not requested. The Appellant posted N. C.'s picture on her Facebook page with the words: "She's missing. Help us find her," and he changed her Facebook account password. According to N. C.'s mother, the Appellant did not ask for money in exchange for his assistance.

Investigator Jones with the DCSO also contacted N. C.'s mother on May 13, 2014, and obtained information about N. C.'s social media accounts. During his investigation that day, Investigator Jones was able to log into a Facebook account registered to N. C. On May 15, 2014, however, he was unable to log directly into N. C.'s Facebook account or access her Facebook page. When he accessed N. C.'s page through the Facebook page of one of her friends, he found that N. C.'s page "had been completely changed." There were "flyers or wanted posters" posted on it along with N. C.'s picture and the Metro Atlanta Human Trafficking Task Force "logo." Investigator Jones "was highly annoyed[, and] knew somebody had accessed [N. C.'s account] and done . . . everything [he] would never do." He explained that kids "communicate via social network" and, because someone had changed N. C.'s password, she "was locked out of her . . . main avenue of communicating with all of her friends [and p]ossibly family."

According to Investigator Jones, his office used social media to assist in locating runaway juveniles, and he monitored missing children's Facebook accounts as part of the investigations. He never altered missing children's Facebook accounts because children knew "[what was] on their page[s], and if [he were] to alter anything, they would know somebody's been there, red flags go up, . . . [and the

4

missing children] will quit using it." Investigator Jones testified that, by posting something on social media, such as a "wanted poster," there was a risk that the children would "disappear." He also testified that he generally did not share detailed information as to the status of the search for a missing child with family members or friends because that information could get back to the missing juvenile and cause him to lose track of the child.

After being locked out of N. C.'s Facebook account, Investigator Jones, with the assistance of DCSO Investigator Wright, found another Facebook account with N. C.'s picture on the page. He testified that he believed that N. C. was not "physically in danger" but was a runaway in the presence of a caring family member. He further testified that the second Facebook account hindered his ability to look for N. C. and he lost track of her for "about four to six hours." He started looking for N. C. in a "completely" different direction which did not lead to her being found and "wasted three investigators [twelve] hours focusing on one complete area that [he thought] was the best lead."[6] But, when that lead failed to locate N. C., Investigator Jones had to go "back to square one" and start over.

---

[6] Investigator Jones testified that, at one point early in the investigation, he had an entire crime division consisting of a Captain, Sergeant, and eight investigators looking for N. C.

On the evening of May 14, the Appellant called DCSO Sergeant Hambrick and identified himself as "Tim Taylor," an "agent" who wanted to discuss N. C., a runaway juvenile. The Appellant stated that the "Metro Atlanta Human Trafficking Task Force" was working on the case, wanted to help, had "accessed her account," and could "track her phone." Sergeant Hambrick gave the Appellant his e-mail address because he did not know the Appellant and was unable to speak with him at the time. The Appellant e-mailed Sergeant Hambrick the next day, using "very common[ ] police terminology." Sergeant Hambrick testified that the Appellant never identified himself as a volunteer of a non-profit organization, nor did he ever tell Sergeant Hambrick that he was not a police officer.

Sergeant Hambrick testified that, on May 15, 2014, DCSO Investigator Wright found a second Facebook account that was opened around the time that N. C. went missing. Investigator Wright subpoenaed the IP address of the Facebook account and the IP address "came back to the residence that [the Appellant] was utilizing." DCSO sent local police officers to the residence associated with the account to look for N. C. The Appellant lived at the residence and was home when the police arrived.

When the Appellant answered the door, he told the officers that he was with the Metro Atlanta Human Trafficking Task Force, that he was working on N. C.'s

case, and that he had been in contact with DCSO investigators. One of the local police officers testified that he looked around the Appellant's home and asked the Appellant why "the investigators would be getting a hit on the IP address that was associated with this house, through [N. C.'s] Facebook account." The Appellant showed the officer N. C.'s Facebook page, which was open on his laptop. The officer testified that it appeared that the Appellant was working from inside the account, and that the information shown on a Facebook page was "significantly different" when viewing another person's page as a visitor compared to viewing the page after logging into that account. The Appellant called Sergeant Hambrick and asked him to explain the situation to the local police officers. Sergeant Hambrick told the officers, "[the Appellant] doesn't work for our agency. He's not working with us on this case."

Sergeant Hambrick testified that he had "numerous conversations and concerns about this case[,]" and he asked Investigator Wright to ask the Appellant to come into the office for a "face-to-face conversation." After speaking to Investigator Wright, Sergeant Hambrick received a phone call from a "Shawna Hutchison,"[7] with the

---

[7] The Appellant testified that he and his partner, "Shawna Hutcheson[,]" owned a non-profit organization, the Metro Atlanta Human Trafficking Task Force, and operated it from their home.

Metro Atlanta Human Trafficking Task Force apologizing for the Appellant "not being able" to come into the office for "a sitdown talk."

N. C.'s mother became "frustrated" with the efforts of the DCSO because she thought the law enforcement agency had not made finding N. C. a priority. She changed her mind, however, when she met with several investigators with the DCSO on May 15, and realized they had paperwork and information about N. C.'s Facebook page. At that meeting, the DCSO told her that they knew about the Appellant, that he was not part of law enforcement, and that she should probably not talk to him or give him information.

N. C.'s mother testified to feeling "scared," "hurt," and "mad" after her discussion with the DCSO about the Appellant, because she had given him all of her and N. C.'s personal information and she would not have done so if he had not been a law enforcement officer. She also decided she did not want to have anything else to do with the Appellant.

Ultimately, N. C. returned home on May 18, 2014. N. C. testified that she never gave the Appellant permission to use any of her personal information, or to alter or lock her out of her Facebook account. According to N. C., her sister saw on N. C.'s Facebook page that the Metro Atlanta Human Trafficking Task Force was looking for

8

her, and N. C. thought the organization was part of the police force. N. C. testified that the Facebook posting caused her to return home because it meant the police and several other people were looking for her. N. C. also testified that she created her first Facebook account when she was ten or eleven years old and created her second Facebook account when she was fifteen years old, but she denied creating an new Facebook account in May 2014. She also denied accessing any of her Facebook accounts while she was away from home.

At trial, the State presented evidence that the Appellant did not possess a Georgia Peace Officers Standard and Training Council certification, the absence of which indicated that he was not a registered law enforcement officer in Georgia. The Division Director for the Professional Licensing Boards Division of the Georgia Secretary of State's Office testified that the Appellant applied for a license to be a private detective in Georgia, but the application was withdrawn because it was not completed within a year.

In addition, the State presented similar transaction evidence showing that, in October 2013, the Appellant visited the City of Palmetto Chief of Police under the name of "Tim Taylor" and "stated he was an agent with the Fugitive Task Force and was assigned to assist" in a missing person case within the city. According to a

Sergeant with the City of Palmetto Police Department ("PPD"), the Appellant wore a "golf-type shirt [with] a [police-type] badge on it." The badge "resemble[d] a [U. S.] Marshal's [one]" and the Appellant wore "a badge on his belt, had a handgun on his right side, and also handcuffs with a magazine on his left [side]." The Sergeant testified that the Appellant held himself out as an agent working with the U. S. Marshal's Office, who assisted the PPD in searching for a missing juvenile by interviewing witnesses and accessing the missing juvenile's computer. During the investigation for the missing juvenile, the Appellant drove a "Ford Crown Victoria, golden color [with] blacked-out windows, a spotlight, . . . a push-bumper on the front, [with] emergency-type lights . . . around the tag area" that emitted a "siren-type sound[.]" When the PPD learned from the Police Officers Standards and Training Council that the Appellant had never been a law enforcement officer, they arrested him. The Appellant pled guilty to impersonating a police officer, false imprisonment, and giving a false name to a law enforcement officer.

Regarding another similar transaction, a City of College Park police officer testified that, at about 4:30 a.m. on July 21, 2013, he was driving home from work in his personal car wearing his uniform. A "darker-colored" Crown Victoria automobile pulled up behind him, a flashing "red light came on in the [Crown Victoria's] dash,"

and the driver followed him for about a quarter of a mile. When the automobile pulled up beside the officer's car, the officer looked at the driver and saw the Appellant, who had a "shocked look, like, 'Oh. That's the police.'" The vehicle sped away, but the officer wrote down the tag number of the Crown Victoria and called 911 because he suspected that the Appellant was impersonating a police officer. An officer from the Coweta County Sheriff's Office responded to the call and found that a Crown Victoria with the tag number was registered to the Appellant. The officer located the vehicle at a residence in Newnan, Georgia, but no one was in the vehicle, and he was unable to make contact with anyone at the house, so the Appellant was not arrested for that incident.

At trial, the Appellant testified that, during his initial contact with DCSO Sergeant Hambrick, he told the officer that he had "pending charges in Fulton County," and claimed that he never misled Sergeant Hambrick into thinking he was a law enforcement officer. The Appellant also denied opening a Facebook account in N. C.'s name. He testified that he e-mailed Sergeant Hambrick to tell him that someone had opened a Facebook account in N. C.'s name approximately 15 hours after she went missing, but he was the only person to establish that time frame. When questioned by the prosecutor, the Appellant agreed that everybody was lying at trial,

11

except for him, and that "[he] watched [his] steps very carefully, because [he] was already under Indictment in Fulton County for impersonating a police officer."

After being convicted on two counts of impersonating an officer, one count of identity fraud, and one count of obstruction, the Appellant filed a motion for new trial. After a hearing, the trial court denied the Appellant's motion. This appeal followed.

> Generally, on appeal from a criminal conviction,
>
> the evidence must be viewed in the light most favorable to support the verdict, and [the Appellant] no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility. The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[8]

With these guiding principles in mind, we turn now to the Appellant's specific claims of error.

1. The Appellant argues there was insufficient evidence to support his convictions on impersonating a peace officer in Counts 1 and 2 of the indictment.

---

[8] *Self v. State*, 245 Ga. App. 270, 270-271 (1) (537 SE2d 723) (2000) (citations and punctuation omitted).

Counts 1 and 2 charged the Appellant with impersonating a peace officer as to Sergeant Hambrick and N. C.'s mother, respectively by "falsely hold[ing] himself out as a peace officer of the Metro Human Trafficking Task Force, with the intent to mislead . . . another person, into believing that [the Appellant] was actually such an officer[.]"

OCGA § 16-10-23 states, in relevant part, "[a] person who falsely holds himself out as a peace officer or other public officer . . . with intent to mislead another into believing that he is actually such officer commits the offense of impersonating an officer[.]" There is no requirement to show that the victims were actually misled, but only that the offender "intended to mislead" the victims.[9]

With regard to Count 1, there was evidence that the Appellant phoned Sergeant Hambrick, identified himself as an "agent," and used common police terminology. Further, the Appellant told the Sergeant that "[the Metro Atlanta Human Trafficking Task Force] got the case[,]" the organization had accessed N. C.'s Facebook account, and the organization could "do things that you can't do with the phone technology." The next day, the Appellant sent Sergeant Hambrick an e-mail that contained a picture of a shield, and the Sergeant testified that, in law enforcement, "[a] detective

---

[9] *Self*, 245 Ga. App. at 272 (1) (a).

13

[was] a police officer who [carried] a shield." Sergeant Hambrick testified that, based on the totality of the phone calls, e-mails, and text messages he received from the Appellant about N. C.'s case and his claims about what the Appellant was able to do in the investigation, he believed the Appellant was a member of law enforcement.[10]

With regard to Count 2, when the Appellant contacted N. C.'s mother by telephone, he identified himself as an investigator with the Metro Atlanta Human Trafficking Task Force, and told her that he used to be a police officer in Atlanta. She testified that, based on the Appellant's self-described qualifications, she believed he was part of law enforcement, and a "top-notch investigator" with a rank higher than the officers with the DCSO. Further, N. C.'s mother testified that she would not have given the Appellant her, or N. C.'s, personal information had she had known otherwise.

The trial court, in its order denying the Appellant's motion for new trial, stated that "[the Appellant's] use of police terminology; inserting himself in a police

---

[10] Sergeant Hambrick's conclusion was consistent with the testimony of Investigator Jones, who testified that he never used a false name during his investigations and that the term, "task force implie[d] that this [was] a specialized law enforcement unit that ha[d] been tasked with the accomplishment of a certain mission." He further testified that when he saw a person wearing a badge, he automatically "believe[d] they [were] in law enforcement."

investigation; . . . carrying a badge and a gun; describing himself as an agent or investigator with a missing persons task force; using a false name; [and] stating that he had unique computer tracking abilities . . . was all conduct designed to mislead others into believing he was an officer[.]"

We agree that a rational trier of fact could have found the Appellant guilty beyond a reasonable doubt of impersonating a police officer during his interactions with Sergeant Hambrick and N. C.'s mother. Therefore, it was not error for the trial court to deny the Appellant's motion for new trial as to these convictions.

2. The Appellant asserts that the evidence was insufficient to support his conviction of identity fraud in Count 3 of the indictment. Count 3 charged the Appellant with "willfully and fraudulently us[ing] the name, picture, and date of birth of [N. C.], identifying information of [N. C.], for the purpose of establishing a Facebook account which purported to be said victim[.]"

Identify fraud is committed when an individual, willfully, fraudulently, and "[w]ithout authorization or consent, uses or possesses with intent to fraudulently use identifying information concerning a person[.]"[11] Identifying information includes any "numbers or information which can be used to access a person's . . .

---

[11] OCGA § 16-9-121 (a) (1).

15

resources[.]"[12] According to OCGA § 16-9-120 (6) (G), resources includes "[a] person's personal history[.]"

In the present case, the evidence showed that the Appellant used the personal information of N. C., which he had obtained from her mother, to alter N. C.'s Facebook page by posting "wanted posters" and to lock N. C. out of her Facebook account by changing the account password. Further, the Appellant testified that only he knew that a new Facebook account had been created under N. C.'s name 15 hours after she went missing. N. C. testified that she did not attempt to access her Facebook account during the time she was away from home.

Although the Appellant argued during the motion for new trial hearing that he did not use N. C.'s personal information to make any money for himself, the trial court, in its order denying the Appellant's motion for new trial, stated that it could not find "a requirement [of] pecuniary gain" as an element of identity fraud. We agree with the trial court and note that the Appellant has not pointed to any legal authority indicating otherwise. We conclude that the evidence presented was sufficient for a rational trier of fact to find the Appellant guilty beyond a reasonable doubt of identity fraud.

---

[12] OCGA § 16-9-120 (5) (R).

3. The Appellant argues there was insufficient evidence to support his conviction on obstruction of a law enforcement officer in Count 4 of the indictment. Count 4 charged the Appellant with "knowingly and willfully hinder[ing Investigator] Jones, a law enforcement officer with the [DCSO,] by creating a fraudulent Facebook account in the name of a missing juvenile who was the subject of an investigation and search by the [DCSO]."

The offense of obstruction of a law enforcement officer is codified in former OCGA § 16-10-24 (a), which states in pertinent part, "a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor."[13]

Here, Investigator Jones, who was the lead investigator in the disappearance of N. C., testified at length that the creation of a fake Facebook account after N. C. was reported missing resulted in three investigators wasting twelve hours looking in the wrong "direction" for the juvenile and hindered his ability to track N. C.'s possible whereabouts for about six hours. As discussed in Division 2, supra, the Appellant altered N. C.'s Facebook account and changed the account password, thereby locking others out of the Facebook account. Further, the evidence showed

---

[13] OCGA § 16-10-24 (a) (2014).

that the Appellant knew that the DCSO was conducting an investigation as to N. C.'s whereabouts when the missing juvenile's Facebook account was altered.

Based on the foregoing, we find that a rational trier of fact could have found the Appellant guilty beyond a reasonable doubt of obstructing Investigator Jones's search for N. C.

*Judgment affirmed. Barnes, P. J., and McMillian, J., concur.*