**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**December 27, 2024**

# In the Court of Appeals of Georgia

A24A1626. MURPHY v. THE STATE.

DILLARD, Presiding Judge.

Following trial, a jury convicted Arianna Murphy on one count of false imprisonment. On appeal, Murphy contends the trial court erred in (1) failing to dismiss the indictment because the State destroyed exculpatory evidence; (2) excluding an allegedly threatening postcard that she received from her co-indictee; (3) failing to provide the jury with a modified instruction on battered-person syndrome; and (4) prohibiting her from asking prospective jurors during *voir dire* if they had ever been involved with prostitution. For the following reasons, we affirm the trial court's rulings as to Murphy's first three claims of error, but because the trial court erred in prohibiting Murphy from asking prospective jurors questions regarding prostitution,

we reverse her conviction and remand the case for further proceedings consistent with this opinion.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that in the early hours of January 1, 2021, Calvin Webb found Murphy's profile on a dating website—on which she used the pseudonym Pocahontas—and decided to contact her. After exchanging a few text messages, Webb asked Murphy if she wanted to meet him at his house, and she agreed to do so. But rather than just give Murphy his home address, Webb provided her with the address of a nearby gas station. And not long thereafter, Webb drove to the gas station and met Murphy, who was initially annoyed that he had not given her his actual home address. Even so, she agreed when Webb suggested that she follow him to his house in her SUV. But what Webb did not know was that Murphy's boyfriend and his friend—Kalik Hall and John Ziegler—were hiding in the backseat of her vehicle.

Once they arrived at Webb's home (which he shared with his brother), Murphy followed Webb inside, making sure to leave the front door unlocked after she entered it. A few minutes later, as Webb and Murphy were hanging out in his living room,

---

[1] *See, e.g.*, *Libri v. State*, 346 Ga. App. 420, 421 (816 SE2d 417) (2018) (explaining the standard of review on appeal from a criminal conviction).

Webb heard his front door open and saw two men with guns—ultimately identified as Hall and Ziegler—rush toward him. At that point, Murphy also pulled out a handgun, as Hall and Ziegler yelled at Webb to lie on the ground. Webb complied, but knowing that his brother was in his bedroom and that his assailants were unaware of this, Webb responded rather loudly to their demands, hoping his brother would be alerted. Webb's gambit worked. And as Hall and Ziegler tied Webb up with some cord (while demanding he tell them where any money or drugs were hidden), his brother quietly called 911 and reported the home invasion in progress.

Meanwhile, Murphy went back outside and entered her SUV to wait as Hall and Ziegler ransacked Webb's house. Moments later, a sergeant with the Spalding County Sheriff's Office arrived on the scene, immediately approached Murphy sitting in her vehicle, and asked her what she was doing. Murphy responded that she was waiting on a friend to meet her so they could go to a nightclub together. Although suspicious, the sergeant left Murphy in her vehicle, went to the front door of Webb's home, knocked, and loudly announced that he was with the sheriff's office. Webb's brother immediately opened his bedroom window (which was near the front door of the house), and told the sergeant his brother was being robbed and that the woman in the

3

SUV was involved in the crime. At the same time, upon hearing the sergeant, Hall and Ziegler forced open a back window and fled through the backyard, taking some of Webb's belongings with them. Webb's brother then alerted the sergeant as to the two assailants' flight, and the sergeant directed a lieutenant—who had just arrived on the scene—to head toward the back of the house; but, by that time, Hall and Ziegler had already escaped.

After determining that Webb and his brother were, in fact, the residents of the home, the two law-enforcement officers returned their attention to Murphy, who had remained in her vehicle. This time, when questioned, Murphy claimed she was there to meet someone named Chris, but that he had texted her and told her to meet him at the nightclub instead of his house. She also denied that anyone else had been with her in her SUV when she arrived and further claimed she had only been there for a few minutes. But based on the information provided by Webb and his brother, including video-surveillance footage from a security camera on Webb's front door, a sheriff's office investigator—who also had now arrived on the scene—transported Murphy to the station and ultimately arrested her. A second investigator impounded Murphy's SUV and searched it, during which she recovered bullets, Murphy's driver's license,

a bag containing zip ties, several mobile phones, and credit cards that did not belong to Murphy, Hall, or Ziegler. In addition, the investigator found a notebook, which appeared to have user names and passwords to several social-media websites.

Thereafter, the State charged Murphy, Hall, and Ziegler,[2] via the same indictment, with one count each of home invasion, armed robbery, aggravated assault, false imprisonment, and possession of a firearm during the commission of a felony.[3] Prior to trial,[4] Murphy filed a motion to dismiss the indictment for failure to preserve evidence. Specifically, she argued the notebook discovered during the search of her vehicle had not been preserved and that it contained information important to her defense—*i.e.*, that she was being sex trafficked by Hall and Ziegler and was forced to arrange the meeting with Webb. On the first day of trial, before jury selection, the trial court heard argument on Murphy's motion and denied it.

---

[2] Law enforcement apprehended Hall several weeks later, and then eventually learned that Ziegler had been arrested for armed robbery and murder in Indianapolis, Indiana, two weeks after robbing Webb.

[3] Ziegler was also charged in the same indictment with one count of possession of a firearm by a convicted felon.

[4] Murphy's co-indictees were not tried with her.

5

The trial of the case then proceeded, during which the State presented the aforementioned evidence through the testimony of Webb, his brother, and the members of the sheriff's office who responded to and investigated the incident. Murphy testified in her own defense, which focused on her contention that Hall—who was her boyfriend—had forced her into prostitution shortly after they met when she was only 16-years-old, and that he and Ziegler had sex trafficked her for several years. She further testified that she feared Hall and Ziegler, explaining Ziegler would hit her if she defied him and that both men had threatened her life. But as for the incident involving Webb, Murphy claimed she was not aware Hall and Ziegler intended to rob Webb, and she had assumed this was a typical sex-for-money transaction, with Hall and Ziegler accompanying her for protection purposes as they usually did. In addition, Murphy called an expert in sex trafficking, who opined that she was a victim of sex trafficking and such victims often will not leave the person trafficking them because of fear or a misplaced trust or both.

At the conclusion of the trial, the jury found Murphy guilty on the false-imprisonment charge but acquitted her on all other charges. Subsequently, she filed a motion for new trial, which the trial court ultimately denied. This appeal follows.

1. Murphy first contends the trial court erred in failing to dismiss the indictment because her right to due process was violated when the State destroyed exculpatory evidence—*i.e.*, the notebook found in her vehicle. And although we are reversing Murphy's sole conviction, *see infra* Division 4, because this contention concerns whether this charge should have been dismissed prior to trial, it is appropriate for us to address it now. In doing so, we find this argument lacks merit.

The Supreme Court of Georgia has held that in determining whether a defendant's constitutional right to due process was violated when the State failed to preserve evidence that could be exculpatory, a court must "determine both whether the evidence was material and whether the police acted in bad faith in failing to preserve the evidence."[5] Importantly, to meet the standard of constitutional materiality, the evidence "must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[6] And as for evaluating bad faith, the Supreme Court of the United States has explained that

---

[5] *Ash v. State*, 312 Ga. 771, 787 (4) (865 SE2d 150) (2021) (punctuation omitted); *accord Goins v. State*, 310 Ga. 199, 202 (3) (850 SE2d 68) (2020).

[6] *Ash*, 312 Ga. at 787 (4) (punctuation omitted); *accord Goins*, 310 Ga. at 202 (3).

requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.[7]

Here, Murphy moved to dismiss the indictment prior to trial, arguing that her right to due process was violated when the sheriff's office investigators failed to preserve the notebook found in her vehicle. Specifically, she claims the notebook contained information about the various social-media websites that Hall and Ziegler had her use to set up "dates," as well as an accounting of money she received for prostitution. As a result, Murphy contends this notebook would have supported her defense that she was only involved in the robbery of Webb because she was a victim of sex trafficking. But in denying Murphy's pre-trial motion and her motion for new trial, the trial court ruled the notebook was not exculpatory, but rather cumulative of other evidence, and that Murphy did not show the investigators' failure to preserve the notebook after her vehicle was impounded was a result of bad faith.

---

[7] *Ash*, 312 Ga. at 790 (4) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (109 SCt 333, 102 LE2d 281) (1988)).

We agree with the trial court's analysis on all accounts. First, Murphy has not shown the notebook's exculpatory value, if any, was apparent to the investigators before it was lost when her vehicle was impounded. Indeed, that a piece of evidence "may be potentially useful in a defendant's attempt at exoneration is insufficient to sustain a claim that the defendant has suffered an abridgment of due process due to the evidence's destruction or loss."[8] Rather, the key is the evidence's "apparent exculpatory value before its destruction or loss, and [our Supreme Court] has defined 'apparent' in this context as 'readily seen; visible; readily understood or perceived; evident; obvious.'"[9] And here, although one of the investigators photographed the first two pages of the notebook—which were admitted into evidence at trial—that investigator testified she did not collect the notebook because she did not view it as evidence pertaining to the home invasion, which was the subject of the investigation. The investigator added that while the notebook may have been important if the investigation had been focused on sex trafficking, Murphy—as she admitted at

---

[8] *Ash*, 312 Ga. at 789 (4) (punctuation omitted); *accord Krause v. State*, 286 Ga. 745, 752 (8) (691 SE2d 211) (2010).

[9] *Ash*, 312 Ga. at 789-90 (4) (punctuation omitted); *accord State v. Mizell*, 288 Ga. 474, 476 (2) (705 SE2d 154) (2011).

trial—did not mention being a victim of sex trafficking until well after her arrest. Given these circumstances, we cannot conclude the notebook's exculpatory value, if any, was obvious or evident to the investigator or any other police personnel who saw it before its loss.[10]

The trial court also correctly determined that there was no evidence the sheriff's office investigators acted in bad faith. Indeed, Murphy points to no specific evidence of bad faith but, rather, seems to argue that we should infer as much because these investigators were "willfully blind" to her being a victim of sex trafficking. Suffice it to say, her speculation in this regard does not constitute evidence that the

---

[10] *See Ash*, 312 Ga. at 789-90 (4) (holding defendant's due-process rights were not violated for failure to preserve evidence because exculpatory value of picture on defendant's cell phone, if any, was not apparent before its destruction as unclaimed property, even though detective obtained a search warrant for it, given that detective never believed picture, which allegedly showed defendant elsewhere on night of shooting, to be exculpatory); *Hill v. State*, 308 Ga. 638, 649 (3) (842 SE2d 853) (2020) (holding that, even if an un-preserved video would have shown what the appellant claims it would have shown, it was not material because its exculpatory value was not apparent before it was lost); *State v. Miller*, 287 Ga. 748, 755 (699 SE2d 316) (2010) (concluding evidence on seized cell phone was not constitutionally material when it was not apparent to police involved in the seizure, custody, or disposition of the cell phone that it could possibly aid defendant in the defense of any criminal charges); *State v. McNeil*, 308 Ga. App. 633, 637-38 (708 SE2d 590) (2011) (reversing trial court's dismissal of charges for failure to preserve exculpatory evidence because nothing suggested that DVD of officer's pursuit of vehicle in which defendant was a passenger had apparent exculpatory value).

loss of the notebook by the sheriff's office was motivated by a conscious desire to deny her the use of it. And even if we were to assume that the loss of the notebook "indicated careless, shoddy and unprofessional investigatory procedures, it did not indicate that the police in bad faith attempted to deny [Murphy] access to evidence that they knew would be exculpatory."[11] Accordingly, Murphy failed to show bad faith on the part of the sheriff's office, and her claim in this regard lacks merit.[12]

2. Murphy also claims the trial court erred by excluding from evidence an allegedly threatening postcard that she received from Hall during her incarceration. And because this issue could recur in a retrial, we will address it now as well. Again, we disagree with Murphy.

---

[11] *Ash*, 312 Ga. at 791 (4) (punctuation omitted).

[12] *See id.* at 790-91 (4) (holding defendant failed to show police department's destruction of allegedly exculpatory evidence was in bad faith when there was no evidence that any department member other than detective believed there was potentially exculpatory evidence on phone, and there was no evidence department's destruction of phone was motivated by a conscious desire to deny defendant the use of evidence connected with phone); *Hill*, 308 Ga. at 649 (3) (concluding that law enforcement's actions resulting in destruction of allegedly exculpatory evidence, at most, amounted to careless procedures and not bad faith); *McNeil*, 308 Ga. App. at 638-39 (reversing trial court's dismissal of charges for failure to preserve exculpatory evidence because defendant did not show evidence was destroyed by police out of an interested or sinister motive or through a conscious doing of wrong).

During Murphy's direct examination at trial, her counsel presented her with a postcard—which included no indication as to the identity of the sender—and asked Murphy if she recognized it. Murphy responded that she did, that it was Hall's handwriting, and that she received it while she was in jail. And while it was not read out loud to the jury, the front of the postcard stated: "I hope you're doing right." Then, on the back of the postcard, it stated, in part: "I hope you make the right choice and pray because everything will be ok." Murphy's counsel then sought to tender the postcard into evidence, but the State objected, arguing that it was hearsay and lacked foundation. Murphy's counsel countered that her recognition of Hall's handwriting laid a sufficient foundation and that the postcard was not hearsay because it was not being offered for the truth of the matter asserted but to show that she reasonably perceived it as a threat (thus demonstrating she had reason to fear Hall). Unpersuaded, the trial court sustained the State's objection. And later, in its order denying Murphy's motion for new trial, the trial court reaffirmed its earlier decision, ruling the postcard did not contain any threats, and therefore, it was properly excluded from evidence as hearsay.

We review a trial court's rulings admitting or excluding evidence for "an abuse of discretion.[13] And we will reverse a conviction for "a trial court's evidentiary error only if it was harmful."[14] Importantly, the test for determining nonconstitutional harmless error is "whether it is highly probable that the error did not contribute to the verdicts, and in conducting that analysis, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done."[15]

Turning to Murphy's specific arguments, OCGA § 24-8-801 (c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." And under OCGA § 24-8-802, "[h]earsay shall not be admissible except as provided by this article; provided, however, that if a party does not properly object to hearsay, the

---

[13] *Sinkfield v. State*, 318 Ga. 531, 545 (6) (899 SE2d 103) (2024) (punctuation omitted); *see Anglin v. State*, 302 Ga. 333, 335 (2) (806 SE2d 573) (2017) ("The admission of evidence is committed to the sound discretion of the trial court, and the trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion.").

[14] *Sinkfield*, 318 Ga. at 545 (6) (punctuation omitted); *see* OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . .").

[15] *Sinkfield*, 318 Ga. at 545 (6) (punctuation omitted); *accord Brock v. State*, 316 Ga. 256, 260 (2) (886 SE2d 786) (2023).

objection shall be deemed waived, and the hearsay evidence shall be legal evidence and admissible." As previously noted, Murphy argues the postcard did not constitute hearsay because it was not offered for the truth of the matter asserted but, rather, to support her defense that she was only involved in the incident at Webb's home because she had been forced into prostitution by Hall and feared both him and Ziegler.[16] But as also noted *supra*, having observed the postcard, the trial court did not believe it could be construed as containing a threat, and we cannot say this decision amounted to an abuse of discretion. Moreover, even if the postcard could be interpreted as a threat and, therefore, as evidence supporting Murphy's defense that her involvement with Hall and Ziegler was only because she was a victim of sex trafficking, it would be of little to no consequence. Murphy testified *at length* in this regard—including explaining her fear of Hall and Ziegler in some detail—and her expert witness also opined that she had been victimized in this manner. Accordingly,

---

[16] *See Anglin*, 302 Ga. at 339 (5) (explaining that victim's widow's testimony regarding a telephone conversation between victim and another person that victim intended to bring gun to meeting with defendant was not offered for the truth of the matter asserted but to show why defendant believed he needed to respond with violence); *Strickland v. State*, 257 Ga. 230, 232 (3) (357 SE2d 85) (1987) (holding it was error to exclude on hearsay grounds testimony regarding death threat made against the defendant, as it was not offered to prove the truth of the substance of the threats but to show why defendant purchased a gun).

14

the postcard was cumulative of other evidence and, as a result, even if its exclusion

constituted error, it was harmless.[17]

3. Murphy further contends the trial court erred by failing to charge the jury on

a modified instruction combining aspects of the sexual-servitude charge with battered-

person-syndrome charge as a form of justification by coercion, and because this issue

also may recur during a retrial, it is appropriate for us to address it now. That said, we

disagree the trial court erred in refusing to provide the requested charge.

As our Supreme Court has explained, for a requested jury instruction to be

warranted, it must be "legal, apt, and precisely adjusted to some principle involved

in the case."[18] More simply put, the only requirement regarding jury charges is that

---

[17] *See Walker v. State*, 306 Ga. 44, 47 (2) (829 SE2d 121) (2019) (holding trial court error, if any, in precluding defendant's sister hearsay testimony that defendant told her after the shooting the victim tried to kill him, was harmless because the testimony was cumulative of defendant's own testimony that he acted in self-defense); *Reaves v. State*, 292 Ga. 545, 548 (2) (d) (739 SE2d 368) (2013) (explaining any error in exclusion of hearsay testimony of defendant's co-worker was harmless in trial for malice murder, first-degree cruelty to child, and aggravated battery, when it was cumulative of other admissible evidence); *Nix v. State*, 280 Ga. 144-45 (5) (625 SE2d 746) (2006) (finding trial court's error, if any, in excluding hearsay testimony of defendant's mother, was harmless given the excluded testimony was largely cumulative of other evidence introduced at trial).

[18] *Harrison v. State*, 310 Ga. 862, 866 (2) (855 SE2d 546) (2021) (punctuation omitted); *accord Barron v. State*, 297 Ga. 706, 708 (2) (777 SE2d 435) (2015).

they "are correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence."[19] And to authorize a jury instruction on a subject, there need only be produced at trial "slight evidence supporting the theory of the charge."[20] Specifically, jury charges "must be adjusted to the evidence in the case,"[21] and we review those charges *de novo*.[22]

Prior to trial, Murphy submitted jury-charge requests, which included, *inter alia*, what was essentially the pattern instruction for coercion.[23] That charge, in part, provided: "A person is not guilty of a crime (except murder) if the act upon which the

---

[19] *Mulkey v. State*, 366 Ga. App. 427, 433-34 (2) (883 SE2d 173) (2023) (punctuation omitted); *accord Hines v. State*, 350 Ga. App. 752, 759 (2) (830 SE2d 380) (2019).

[20] *Jones v. State*, 287 Ga. 770, 771 (2) (700 SE2d 350) (2010) (punctuation omitted); *accord Durden v. State*, 327 Ga. App. 173, 179 (6) (755 SE2d 909) (2014); *Hughes v. State*, 323 Ga. App. 4, 7 (2) (746 SE2d 648) (2013).

[21] *Millen v. State*, 267 Ga. App. 879, 881 (2) (a) (i) (600 SE2d 604) (2004); *see Nations v. State*, 345 Ga. App. 92, 100 (3) (812 SE2d 346) (2018) ("It is axiomatic that a jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law." (punctuation omitted)); *Reid v. State*, 341 Ga. App. 604, 613 (5) (a) (802 SE2d 42) (2017) (same).

[22] *Hines*, 350 Ga. App. at 759 (2)(punctuation omitted); *accord Matos-Bautista v. State*, 353 Ga. App. 773, 776 (1) (839 SE2d 260) (2020).

[23] *See* Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.22.10 (4th Ed.).

supposed criminal liability is based is performed under such coercion that the person reasonably believes that performing the act is the only way to prevent his/her imminent death or great bodily injury." Subsequently, just before the charge conference during her trial, Murphy submitted amended—more accurately additional—requests to charge. Those requests included the pattern charge for justification, generally,[24] the definition for coercion within the sex-trafficking statute,[25] and the statute pertaining to affirmative defenses to certain sexual crimes.[26] Also included in those amended requests to charge was a modification, indicated by bracketed text, of the pattern instruction on the defense of battered-person syndrome ("BPS"),[27] which read as follows:

---

[24] *See* Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.01.10 (4th Ed.).

[25] *See* OCGA § 16-5-46 (a) (1) (a)-(2).

[26] *See* OCGA § 16-3-6 (b) ("A person shall not be guilty of a sexual crime if the conduct upon which the alleged criminal liability is based was committed by an accused who was: (1) Less than 18 years of age at the time of the conduct such person was being trafficked for sexual servitude in violation of subsection (c) of Code Section 16-5-46; or (2) Acting under coercion or deception while the accused was being trafficked for sexual servitude in violation of subsection (c) of Code Section 16-5-46.").

[27] *See* Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.10.14 (4th Ed.).

17

I charge you that if you find from the evidence that the defendant [has been coerced into sexual servitude], you may consider that evidence in connection with the defendant's claim of [justification by coercion]. Such evidence relates to the issue of the reasonableness of the defendant's belief that the use of force was immediately necessary, even though no use of force against the defendant may have been, in fact, imminent. The standard is whether the circumstances were such that they would excite the fears of a reasonable person possessing the same or similar psychological and physical characteristics as the defendant and faced with the same circumstances surrounding the defendant at the time the defendant used force.

During the charge conference, the trial court questioned Murphy's counsel as to whether this charge applied to the facts of the case, and counsel responded that based on their expert's testimony, a victim of sex trafficking is similar to a battered person in that both types of victims may acquiesce to their abusers even when it appears they have opportunities to escape. Counsel further argued that "[w]hat [the modified instruction] is meant to explain is why she would go along with this, even though the danger's not necessarily immediate. Which is the same theory in a self-defense case: why would a woman, whose husband is asleep, kill him, even though he's not direct threat to her at that time." After additional queries from the trial court, Murphy's counsel concluded: "It's a coercion defense with the explanation of why

it wasn't immediately coerced." But unpersuaded, the trial court ruled that although it would instruct the jury on justification, it would not instruct the jury on Murphy's modified BPS defense. In addition, the trial court ruled that it would not instruct the jury on the statute pertaining to affirmative defenses to sexual crimes, given that Murphy had not been charged with any such crimes.

After both parties rested and presented closing arguments, the trial court instructed the jury on the applicable law, which included the pattern instruction on justification, generally.[28] Additionally, the trial court instructed the jury on the defense of coercion as follows:

> A person is not guilty of a crime if the act upon which the supposed criminal liability is based is performed under such coercion that the person reasonably believes that performing the act is the only way to prevent his or her imminent death or great bodily injury.

> Coercion involves the involuntary performance of a criminal act under fear induced by threats or menaces involving a direct danger to life or great bodily injury when the danger can be avoided only by the performance of the criminal act.

---

[28] *See supra* note 24.

In order for duress or fear produced by threats or menaces to be a valid legal excuse for doing something that would otherwise be criminal, the act must have been committed under threats or menaces that show that the defendant's life or a part of the defendant's body was in danger; or that there was a reasonable cause to believe there was such danger; and that the accused, in order to protect himself or herself from the threat of harm, had no alternative course of conduct but to commit the alleged criminal act.

The danger must not have been one of future violence but, rather, must have been one of present, imminent, and immediate violence at the time the alleged act was committed.

The burden rests upon the State to disprove coercion beyond a reasonable doubt.

Murphy reserved her objection to the trial court's refusal to provide her modified instruction and the charge on affirmative defenses to sexual crimes and, on appeal, she similarly argues the court below erred by not charging the jury on these issues. But the Supreme Court of Georgia has "clearly and consistently held that the only defense theory that BPS is admissible to support is a justification defense based

on self-defense against the victim."[29] In this case, Murphy did not assert a claim of self defense against the victim, Webb. Further, and importantly, Georgia's appellate courts have "similarly rejected attempts to extend the use of evidence regarding the defendant's BPS or other psychological conditions to support other affirmative defenses that traditionally and statutorily require application of an objective, reasonable-person standard, including the defense of coercion."[30] And given that our appellate courts have precluded even the introduction of evidence of BPS to support any defense other than self defense in homicide cases, the trial court here did not err by refusing to instruct the jury on Murphy's modified BPS or on affirmative defenses

---

[29] *Virger v. State*, 305 Ga. 281, 299 (9) (b) (824 SE2d 346) (2019); *see Smith v. State*, 268 Ga. 196, 199 (486 SE2d 819) (1997) ("It has long been the position of this Court that the battered person syndrome is not a separate defense, but that evidence of battered person syndrome is relevant in a proper case as a component of justifiable homicide by self-defense.").

[30] *Virger*, 305 Ga. at 300 (9) (b) (punctuation omitted); *see Pickle v State*, 280 Ga. App. 821, 830-32 (1) (635 SE2d 197) (2006) (unanimously affirming the exclusion of expert testimony regarding the defendant's BPS to support her coercion defense), *disapproved of on other grounds by Virger*, 305 Ga. at 304 (9) (c) n.16; *Graham v. State*, 239 Ga. App. 429, 431-32 (521 SE2d 249) (1999) (same).

to sexual crimes, as neither instruction was legally apt or adjusted to the evidence in the case.[31]

4. Lastly, Murphy contends the trial court erred by prohibiting her from asking prospective jurors during *voir dire* if they had ever been involved with a prostitute or a pimp. We agree.

The Supreme Court of the United States has held that "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."[32] And indeed, the right to criminal trial by an impartial jury is "textually guaranteed by both the United States and Georgia Constitutions."[33] Toward that end, *voir dire* is the "engine of selecting a jury that will

---

[31] *See Adame v. State*, 244 Ga. App. 257, 258-59 (1) (534 SE2d 817) (2000) (finding trial court did not err in refusing to provide BPS instruction to jury in defendant's trial on aggravated assault and criminal damage to property charges, as defendant failed to present evidence supporting such instruction); *see generally supra* note 30 & accompanying text.

[32] *Morgan v. Illinois*, 504 U.S. 719, 727 (II) (A) (112 SCt 2222, 119 LE2d 492) (1992) (punctuation omitted).

[33] *Ellington v. State*, 292 Ga. 109, 124 (7) (b) (735 SE2d 736) (2012) (punctuation omitted), *disapproved on other grounds by Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018); *see* U.S. Const. Amend. VI ("In all criminal prosecutions, the

be fair and impartial."[34] Consequently, while recognizing that trial judges must have "substantial discretion to oversee jury selection and that this subject is largely governed by state laws and practices, the Supreme Court of the United States has held that due process requires that voir dire be sufficient to allow the parties and the trial court to elicit juror bias."[35]

Under Georgia law, the scope of *voir dire* is quite broad, as OCGA § 15-12-133, in part, provides:

> In all criminal cases, both the state and the accused shall have the right
> to an individual examination of each prospective juror from which the

---

accused shall enjoy the right to a speedy and public trial, by an impartial jury . . ."); Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a) ("In criminal cases, the defendant shall have a public and speedy trial by an impartial jury; and the jury shall be the judges of the law and the facts.").

[34] *Ellington*, 292 Ga. at 124 (7) (b).

[35] *Id.*; *see Morgan*, 504 U.S. at 729 (II) (C), 735 (II) (D) (holding that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors," including jurors who would automatically impose a death sentence "regardless of the facts and circumstances" of the case); *Rosales–Lopez v. United States*, 451 U.S. 182, 188 (II) (101 SCt 1629, 68 LE2d 22) (1981) ("Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. Similarly, lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts." (citation omitted)).

jury is to be selected prior to interposing a challenge. . . . In the examination, the counsel for either party shall have the right to inquire of the individual prospective jurors examined touching any matter or thing which would illustrate any interest of the prospective juror in the case, including any opinion as to which party ought to prevail, the relationship or acquaintance of the prospective juror with the parties or counsel therefor, any fact or circumstance indicating any inclination, leaning, or bias which the prospective juror might have respecting the subject matter of the action or the counsel or parties thereto, and the religious, social, and fraternal connections of the prospective juror.

Significantly, the Supreme Court of Georgia has held that OCGA § 15-12-133 "allows voir dire questions beyond those that the Constitution would require allowing."[36]

In mapping the parameters of permissibility, our Supreme Court has noted that "Georgia law is clear regarding voir dire questions at two opposing poles."[37] At one end, the subject matter of a criminal case "clearly includes the fact that it is a criminal

---

[36] *Ellington*, 292 Ga. at 125 (7) (b); *see Legare v. State*, 256 Ga. 302, 304 (1) (348 SE2d 881) (1986) ("It has also been held that OCGA § 15-12-133 encompasses questions regarding possible racial prejudice and bias, even when such questioning would not be constitutionally required."); *Tucker v. State*, 249 Ga. 323, 326-28 (290 SE2d 97) (1982) (same).

[37] *Ellington*, 292 Ga. at 125 (7) (b).

case, as well as the offenses charged in the indictment."[38] But at the other pole, many cases hold that "pre-judgment" questions "may not be asked in voir dire in an effort to have prospective jurors commit themselves to a particular outcome based on specific facts of a case."[39] Such cases have involved situations in which "the question(s) at issue involved an outline of the case, multiple detailed facts, wording that asked the prospective juror to commit to a particular verdict based on hypothesized facts, or requests for the jurors to opine on what facts they would consider important."[40] Significantly, our Supreme Court has explained that "voir dire

---

[38] *Id.* (citations and punctuation omitted).

[39] *Id.* at 126 (7) (b).

[40] *Id.* (punctuation omitted); *see, e.g.*, *Nance v. State*, 280 Ga. 125, 127-28 (6) (623 SE2d 470) (2005) (holding that a question listing the specific circumstances of the case and then inquired whether the prospective juror could vote for a life sentence, improperly sought a prejudgment); *Sallie v. State*, 276 Ga. 506, 509-10 (3) (578 SE2d 444) (2003) (finding voir dire question recounting several details about case and then asking if such would be considered by juror was improper); *Lucas v. State*, 274 Ga. 640, 646 (1) (555 SE2d 440) (2001) (holding that the trial court did not err in limiting defendant's voir dire of prospective jurors on the subject of their willingness to consider "specific items of allegedly-mitigating evidence" and preventing the defendant from asking what type of mitigating evidence the jurors would find compelling).

is not intended to pre-try the case on hypothesized facts and get jurors to commit to the outcome based on that speculative proof."[41] All of that being said, because "there is often a fine line between asking potential jurors how they would decide the case and questions that merely seek to expose bias or prejudice, the scope of the voir dire examination, of necessity, must be left to the sound discretion of the trial court."[42]

Given the foregoing statutory and case authority, the trial court in this matter abused its discretion by prohibiting Murphy from asking prospective jurors whether they had ever had any involvement with prostitution. More specifically, we do not agree with the trial court's assessment that such a question amounted to pre-judgment of the case, as it was quite general in nature and could not accurately be characterized as an "effort to have prospective jurors commit themselves to a particular outcome based on specific facts of a case."[43] Rather, the purpose of the question was to determine if any of the prospective jurors would be impermissibly prejudiced against

---

[41] *Ellington*, 292 Ga. at 126 (7) (b).

[42] *Id.* at 127 (7) (b); *accord Sallie*, 276 Ga. at 510 (2); *see Anderson v. State*, 309 Ga. 618, 628 (5) (a) (847 SE2d 572) (2020) (noting "the scope of voir dire and the propriety of particular questions are left to the sound discretion of the trial court" (punctuation omitted)).

[43] *Ellington*, 292 Ga. at 126 (7) (b).

Murphy upon learning that she was a prostitute.[44] Indeed, as our Supreme Court has

explicitly held

> the "subject matter of the action" as to which voir dire is permitted
> under OCGA § 15–12–133 extends beyond the crimes charged in the
> indictment and the sentences the charges carry to *other "critical facts" of*

---

[44] *See id.* at 127-29 (7) (c) (holding whether the prospective jurors would automatically vote for a death sentence in any case in which two murder victims were young children, as two of the three victims in this case were, was not asking prospective jurors to pre-judge matter, and therefore, trial court erred in prohibiting defendant from asking such questions); *Meeks v. State*, 269 Ga. App. 836, 840-41 (2) (605 SE2d 428) (2004) (holding trial court abused its discretion in relying on general impartiality questions in a case charging child molestation and similar offenses rather than allowing the defendant to "ask prospective jurors whether they had such strong feelings about child molestation that it would impair their judgment or make it difficult for them to judge the case" (punctuation omitted)). *Cf. Thomas v. State*, 296 Ga. 485, 488-89 (2) (769 SE2d 82) (2015) (holding State's question to prospective jurors asking "is there anyone who believes a person who assists another should not be prosecuted" was not asking jurors to pre-judge but sought to determine prejudice in the mind of any prospective juror and, thus, trial court did not err in allowing it); *Quintana v. State*, 276 Ga. 731, 733 (2) n.5 (583 SE2d 869) (2003) (ruling that the trial court did not abuse its discretion in allowing the State to ask, in a case in which defendant allegedly committed murder while using drugs, whether prospective jurors believed that "alcohol and/or drugs could make you impulsive" or "could make a person violent," and allowing the defendant to ask "whether anyone held views of illicit drugs that would prevent them from being an impartial juror" (punctuation omitted)); *Childers v. State*, 228 Ga. App. 214, 215 (2) (491 SE2d 456) (1997) (explaining in case involving aggravated battery charge arising from an incident of domestic violence, calling domestic violence the "subject matter of the action" and approving the State's questions about prospective jurors' "personal beliefs concerning domestic violence issues" (punctuation omitted)).

*the case* that experience, reason, and common sense indicate will be so influential for at least some prospective jurors that they will be unable to consider all of the evidence in the case in light of the court's instructions on the law and render a fair and impartial verdict.[45]

And here, prostitution was arguably a critical fact of the case. Indeed, it was a focal point of Murphy's defense such that prohibiting questions about prostitution created "a real risk that juror partiality driven by the fact at issue will not otherwise be identified in voir dire."[46]

Even so, we must still consider whether the trial court's abuse of discretion amounted to reversible error. As the Supreme Court of Georgia has explained, "[t]o the extent that the court's ruling violated [Murphy's] statutory rights under OCGA § 15-12-133, the error may be deemed harmless if the State can show that it is highly probable that the error did not affect the result of the trial."[47] But to the extent that

---

[45] *Ellington*, 292 Ga. at 135-36 (7) (e) (punctuation omitted) (emphasis supplied).

[46] *Id.* at 137 (7) (e).

[47] *Id.* at 138 (7) (f); *see Legare*, 256 Ga. at 303-04 (1) (addressing a violation of the statutory right to adequate voir dire by determining if it was highly probable that the error was harmless).

the ruling impaired Murphy's constitutional right to due process, we could "affirm only if the error was harmless beyond a reasonable doubt."[48] In this matter, as noted *supra*, Murphy's *principal* defense was that she was only at Webb's house because she was a victim of sex trafficking, forced into prostitution. And although the jury acquitted Murphy of all but one charge, it is possible that she could have chosen an even more sympathetic jury if at least one of the jurors selected expressed a view on the prostitution issue that would have led Murphy to use a peremptory strike to remove him or her. Given these particular circumstances, we simply cannot say it was highly probable that the error did not affect the trial result, much less that the error was harmless beyond a reasonable doubt.[49] Accordingly, we reverse Murphy's false-

---

[48] *Ellington*, 292 Ga. at 138 (7) (f); *see Chapman v. California*, 386 U.S. 18, 24 (III) (87 SCt 824, 17 LE2d 705) (1967) (holding that, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt").

[49] *See Ellington*, 292 Ga. at 138-39 (7) (f) (holding trial court's refusal to allow defendant to ask voir dire questions to elicit any partiality of prospective jurors based on the status of two murder victims as young children was not harmless as to death sentences because it could not be said with the necessary confidence that not a single juror would have automatically imposed the death sentence for any child murder or that at least one prospective juror would have expressed a bias on the issue that would have resulted in a peremptory strike).

imprisonment conviction and remand the case for retrial on that charge if the State chooses to do so before a properly qualified jury.

*Judgment affirmed in part, reversed in part, and case remanded. Padgett, J., fully concurs in Divisions 1-3, and concurs in judgment only in Division 4; Brown, J., concurs in judgment only.*